IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

LORI ROBINS,

       Plaintiff,                      CASE NO.: 9:24-cv-81213-AHS

v.

ABERDEEN GOLF & COUNTRY
CLUB, INC, a Florida Not-For-Profit
Corporation; WATERFORD AT
ABERDEEN ASSOCIATION, INC.,
a Florida Not-For-Profit Corporation,

       Defendants.

_____/

## AMENDED COMPLAINT

COMES NOW Plaintiff, LORI ROBINS (hereinafter referred to as "Plaintiff"), by and through the undersigned counsel, and files this Amended Complaint against Defendants, ABERDEEN GOLF & COUNTRY CLUB, INC., a Florida Not-For-Profit Corporation (hereinafter referred to as "ABERDEEN"), and WATERFORD AT ABERDEEN ASSOCIATION, INC. (hereinafter referred to as "WATERFORD"), (referred to collectively as "Defendants"), and in support thereof, alleges as follows:

1.      This is an action for declaratory, injunctive, and monetary relief brought pursuant to the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12182 et. seq., the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 et seq., and the Florida Fair Housing Act ("FLFHA"), § 760.20, et seq.

2.      Plaintiff, a legally blind individual, seeks redress for Defendants' discriminatory housing practices based on disability and their discriminatory practices in public accommodations,

including their failure to provide reasonable accommodations, imposition of discriminatory terms and conditions, and retaliation against Plaintiff for asserting her fair housing rights.

## JURISDICTION AND VENUE

3.      This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 343 for Plaintiff's claims arising under the ADA and FHA. See also, 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards. This court has supplemental jurisdiction under pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under the FLFHA.

4.      Venue is proper in the Southern District of Florida, West Palm Beach Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court For the Southern District of Florida as all events giving rise to the lawsuit occurred in Palm Beach County, Florida.

## PARTIES

5.      Plaintiff, LORI ROBINS, is a resident of the State of Florida, an individual with a qualified disability, and is otherwise *sui juris.*

6.      Defendant, ABERDEEN, is the lessee, operator, owner and lessor of the premises subject to this suit, located at 8251 Aberdeen Dr, Boynton Beach, Florida 33472 ("Premises"), and is the owner of the improvements where the Premises are located.

7.      Defendant, WATERFORD, is a subdivision of ABERDEEN, where the residential property giving rise to this dispute is located, at 8492 Heather Place, Boynton Beach, Florida 3347 ("Residence").

8.      Defendants are authorized to conduct, and are in fact conducting, business within the state of Florida.

## GENERAL ALLEGATIONS

9.     Plaintiff is a current resident at WATERFORD, a subdivision of ABERDEEN, and has resided there since purchasing her Residence in September of 2022. Said Residence is Plaintiff's homestead property.

10.     Plaintiff suffers from a "qualified disability" under the ADA, FHA, and FLHA. Plaintiff is legally blind, a multiple organ transplant recipient, and a survivor of uterine cancer. As such, she is considered disabled in accordance with federal, state, and local county ordinances.

11.     The nature of Plaintiff's vision impairment is as follows: **Left Eye**: total retinal detachment, *zero vision*; **Right Eye**: excessive retinal tissue scarring from eight (8) retinal vitrectomies (reattachment surgeries) with a central tunnel of vision measuring 3-6 degrees, out of the 270 degrees of visual range enjoyed by sighted people.

12.     Due to the nature of her disability, Plaintiff requires certain reasonable accommodations including, but not limited to, the use of screen readers to access content-laden formats, fully accessible paths of travel throughout the Premises, fully accessible service and eating areas, and well-lit areas to engage in day-to-day activities.

13.     Defendants have been at all times aware of Plaintiff's disability and Plaintiff's need for such accommodations.

### *ABERDEEN'S WEBSITE AND FACILITIES*

14.     Prior to the purchase of her Residence, Plaintiff made a specific inquiry regarding ABERDEEN's website accessibility given the limitations of her disability.

15.     ABERDEEN's website is an integral aspect of resident life as it is the only means through which members are provided access to events and activity schedules, registration for events, and processing payments.

16.     ABERDEEN's website provides that "[a]ll membership categories entitle members to have *full use* of the Clubhouse, Panache Dining Room, Oasis Restaurant, Sunset Lounge, three resort-style pools with jacuzzi, Fitness Center, Card Room, Pickle Ball, Bocce, Clubs and Activities, and Aerobics Classes." (*emphasis added*).

17.     It is mandatory for all WATERFORD residents to purchase a membership, further requiring utilization of the website to access further amenities and the use of ABERDEEN's facilities.

18.     WATERFORD and ABERDEEN assured Plaintiff that its website was accessible to her disability and that Plaintiff would have access to the full services of ABERDEEN's mandatory membership.

19.     Plaintiff subsequently purchased her Residence based upon WATERFORD and ABERDEEN's representations of ABERDEEN's required compliance with the ADA. Plaintiff also purchased the mandatory membership for just over $53,000, with annual fees of $14,000 for the 2022-2023 year and $16,000 for the 2023-2024 year (ending October 31, 2024).

20.     After purchasing her home, Plaintiff was provided with log-in access to ABERDEEN's membership portal. Upon logging in, Plaintiff immediately discovered the website was inaccessible to screen readers, which she required, and the website text could not be fully enlarged to an accessible, readable font size.

21.     Plaintiff subsequently placed ABERDEEN on written notice of the website's deficiencies; however, to this day, ABERDEEN has made no modifications to its website.

22.     Plaintiff encountered further barriers to fully engage in and enjoy the amenities and facilities privileged by her membership at ABERDEEN and repeatedly made requests for basic accommodations, both verbally and in writing, to ABERDEEN and its Board of Directors. Said requests specifically included, but were not limited to:

    a.  Full and equal access to ABERDEEN's online membership portal;

    b.  Full and equal access to ABERDEEN's facilities and amenities;

    c.  Safe and unimpeded means of access to ABERDEEN's facilities and amenities; and

    d.  Responsiveness from ABERDEEN's staff to address requests for reasonable accommodation and compliance with the ADA;

23.     Despite these repeated requests, Plaintiff has been subjected to discriminatory conduct and denied access to the common elements of the community while these amenities are made available not only to all residents of ABERDEEN but also to the *general public*.

24.     All members of the public are eligible to purchase a membership at ABERDEEN. There are no membership eligibility requirements nor meaningful conditions or limitations of exclusivity required, such as being a resident at ABERDEEN. The only requirement is payment of the membership dues.

25.     ABERDEEN goes so far as to solicit, advertise, and sell memberships to the general public on its website, social platforms, and by publishing promotional articles in local and national media, all of which are publicly available.

26.      Regardless of membership, however, these amenities and facilities are available for use by non-residents and non-members of ABERDEEN.

27.     There are no physical barriers to enter ABERDEEN facilities by non-members such as locked or gated entrances, no security features, nor patrolled checkpoints to prevent public

access to the club's facilities. There is no procedure to verify membership or otherwise distinguish from who is an ABERDEEN member, a bona fide guest, or simply a member of the general public. Public citizens who are not guests of any member or resident are able to freely access the bars, lounges, pools, fitness areas and other amenities of ABERDEEN's facilities completely unmonitored.

28.     Members of the general public are also able to access ABERDEEN's facilities for meetups, lectures, parties, card games, table games, and other social events.

29.     ABERDEEN also regularly uses their amenities and facilities to host public events including yoga classes, barbecues, food trucks, holiday socials, sports clinics and tournaments, and an annual family carnival, all of which are open to non-members of the general public.

30.     ABERDEEN falsely claims itself to be a "private club" and fails to provide any semblance of exclusivity for those holding membership, such as restricting access of its amenities and facilities to members of the general public.

31.     As a result of ABERDEEN's failure to comply with Title III of the ADA and provide reasonable accommodations, Plaintiff has encountered barriers (both physical and intangible) that interfered with – if not outright denied – Plaintiff's ability to use and enjoy the facilities, privileges and accommodations offered at ABERDEEN.

32.     Plaintiff was and continues to be, deterred from using the amenities of ABERDEEN because the facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiff due to her physical disabilities.

33.     Plaintiff has lived at WATERFORD and been a member of ABERDEEN since the purchase of her Residence in 2022 and must have ongoing access to the facilities thereof.

34.     Provided that ABERDEEN makes the necessary reasonable accommodations to the Premises and modifies the policies and practices to accommodate individuals who have physical disabilities, Plaintiff intends to reside at her Residence for years to come as it is her homestead.

35.     At all relevant times, ABERDEEN has possessed and enjoyed sufficient control and authority to modify the Premises and to remove impediments to access and to comply with the ADA.

36.     To date, ABERDEEN has refused to remove such impediments and has failed to make reasonable accommodations that conform with accessibility standards outlined in the ADA.

### *WATERFORD'S WEBSITE AND FACILITIES*

37.     Shortly after learning of ABERDEEN's website deficiencies, Plaintiff discovered that WATERFORD's website was completely inaccessible to her as well.

38.     WATERFORD's website is an essential aspect of resident life for members of its HOA, such as Plaintiff, as it is the only means through which members are provided access to important information including but not limited to, forms and documents, vehicle registration information, as well as community guidelines and regulations.

39.     WATERFORD's website is incompatible with screen readers, which Plaintiff requires due to her disability.

40.     Specifically, the screen reader is unable to perform essential functions including but not limited to, announcing PDFs/forms on the various website pages, and calling out elements and information throughout the webpage.

41.     These deficiencies prevent visually impaired users such as the Plaintiff from accessing important information, navigating forms and/or procedures, and understanding the content displayed on each webpage.

42.     In the recent months of 2024, WATERFORD began a transition of its property management company from Davenport to GRS Management Association ("GRS").

43.     As a result of the transition, WATERFORD now began requiring residents to make monthly assessments through GRS' resident portal. However, GRS' resident portal cannot be accessed to login by screen readers.  As a result, Plaintiff could not set up a payment method or access any of the information that WATERFORD and/or GRS has set up for all the residents of WATERFORD.

44.     Similarly, WATERFORD now requires that repairs and work orders be submitted through this GRS resident portal.

45.     WATERFORD's pool area is inaccessible due to the requirement that a key be used unlock the gate.  Plaintiff has made multiple Requests for Accommodation that the key lock be replaced with an accessible push button or voice-controlled lock.

46.     WATERFORD through GRS sent out numerous written correspondence via US MAIL that are written in a font that is not accessible, despite multiple prior requests by Plaintiff. As just two examples:

a.  On or about September 26, 2024, Plaintiff received a notice letter from GRS indicating how WATERFORD residents were expected to access the GRS portal including website, access information, and where to locate community documentation.

b.  On November 12, 2024, Plaintiff received a notice letter from GRS indicating that they no longer had her insurance declaration on file and gave her 30-days to provide another copy. The notice letter was not provided to Plaintiff in a format that is

accessible to her as she, again, was unable to read the font size or further access the letter with her adaptive technology.

47.     Despite Plaintiffs multiple and ongoing attempts at communicating her reasonable requests for accommodation, WATERFORD, through GRS, continues to refuse to comply.

### ELECTIONS AND BYLAWS AT ABERDEEN AND WATERFORD

48.     For each year that Plaintiff has been a resident member at ABERDEEN and WATERFORD's Homeowner's Association ("HOA"), she has been unlawfully denied the right to vote and participate in the 2023 and 2024 Elections for ABERDEEN and WATERFORD's HOA Board of Directors ("Election").

49.     Given both ABERDEEN and WATERFORD's website deficiencies, Plaintiff informed ABERDEEN, WATERFORD, and Defendants' property management companies of her disability and requested that correspondences be sent to her electronically and in an accessible format, as she is unable to read font sizes smaller than Arial 22 in a hardcopy mailing.

50.     Shortly prior to the elections, Plaintiff received in her mailbox correspondences from ABERDEEN and WATERFORD concerning the elections and was unable to read the font size.

51.     Plaintiff thereafter informed ABERDEEN and WATERFORD on both occasions requesting it provide the documents in a format that was accessible to her as soon as possible, given that the election would take place later that month, in March 2023 and March 2024 respectively.

52.     She also requested ABERDEEN and WATERFORD arrange to retrieve her completed ballots from her residence before the election deadline to ensure it would be included in the vote count.

53.     Plaintiff received no response to her accommodation request and was, therefore, unable to read the correspondences with regard to the election and was denied the opportunity to participate in the voting process for the open board positions in both 2023 and 2024.

54.     As a member of ABERDEEN's and of WATERFORD's HOA, Plaintiff enjoys the same rights as all non-disabled members to vote for her choice of candidates for the Board of Directors in the hosted elections and access Defendants' amenities.

55.     ABERDEEN further discriminated against Plaintiff on the basis of her disability by unlawfully denying her rights to access and review ABERDEEN's 2024 proposed amendments to their bylaws. These proposed amendments were available for members to review through ABERDEEN's website.

56.     As alleged above, ABERDEEN's website was and remains completely inaccessible to Plaintiff.

57.     Plaintiff, informed ABERDEEN of her inability to access its website on multiple occasions and requested reasonable accommodations that would allow her to participate in reviewing ABERDEEN's bylaws.

58.     Plaintiff's requests were made to no avail as ABERDEEN continued to ignore them, preventing her participation and thereby further discriminating against Plaintiff on the basis of her disability.

### *RETALIATION BY ABERDEEN*

59.     On numerous occasions, Plaintiff made concerted efforts to enlist the assistance of ABERDEEN's General Manger, Jeffrey Riegler, the Director of Food and Beverage, Mohammad Rahgozar, the nine members of the Board of Directors, as well as the President of the Membership

Ambassador Committee, Ellen Gold, in accessing the services, facilities, activities and clubs that were to be included in her membership.

60.     Plaintiff was determined to try to work with Mr. Riegler, his management team and the Board, however, her efforts were vehemently met with false statements, stonewalling, gas lighting, harassment by Mr. Rahgozar's staff in front of the other members, and brutal, widespread acts of retaliation, making Plaintiff a target for widespread derision within the community.

### Meetings

61.     On January 16, 2023, Mr. Riegler, arranged a meeting in which he promised to respond to Plaintiff's six unacknowledged requests for accommodation. The meeting was held in Mr. Riegler's office which required Plaintiff to take a car service at significant cost.

62.     Upon Plaintiff's arrival to Mr. Riegler's office, it became immediately apparent that Mr. Riegler had no intention of responding to her requests.

63.     During this meeting, Plaintiff was forced to discuss the intimate details of her disability in the presence of non-required attendees, which was an unjustified violation of her right to medical privacy.

64.     Mr. Riegler ultimately refused to discuss the requested accommodations, the sole purpose of the meeting.

65.     Not one of her requests for accommodation were approved during this meeting.

### Site Tour

66.      All new members of Aberdeen Country Club receive a site tour as part of ABERDEEN's routine new member introduction package as well as ABERDEEN merchandise including a golf hat, water bottle and membership badge. Plaintiff was not offered any of these items, despite requesting them repeatedly.

67.     As a visually impaired social member of ABERDEEN, Plaintiff specifically requested and required a tour of the accessibility components of the grounds, such as the location of the ramps, railings, elevators, bathrooms, fire exits, etc.

68.     Plaintiff also required an accessibility review of the Fitness Center in order to determine whether the Fitness center was at all accessible to her use under her membership contract.

69.     Additionally, the Aquatics Areas, which contain three pools and an elaborate set of walkways, located on several different levels, had not be toured for accessibility and safety and Plaintiff was concerned that this area posed an imminent risk to her safety.

70.     Plaintiff needed to understand what types of accessibility options were provided that permit safe use of these facilities, for which use she is billed monthly.

71.     Plaintiff was denied a tour of the facility by Mr. Riegler, the ABERDEEN Board, the ABERDEEN Membership Director, and Ms. Gold, who had provided a site tour to every other new member in her role as ABERDEEN Board's New Member Ambassador.

72.     Plaintiff repeatedly requested that Mr. Riegler to assign someone to show her where the elevator was, where the ramps and fire escapes were, how to safely access the pool areas, and which pieces of equipment in the fitness center offered braille or voice interaction to provide some way for her to access the exercise equipment.

73.     Mr. Riegler ignored each of Plaintiff's requests and refused to acknowledge that she had made any requests for accommodation.

74.     Mr. Riegler never issued a response to any of Plaintiff's requests, hoping Plaintiff would eventually give up and leave ABERDEEN for good.

75.     On January 24, 2023, Ms. Gold called Plaintiff to "check in" to see how she was enjoying the membership. Plaintiff responded that she was very upset as she was having "accessibility issues" with the ABERDEEN Board of Directors.

76.     Instead of inquiring as to how she could be of assistance, Ms. Gold responded, "Why? Because they don't call each other up every morning to see who is going to pick Lori up and drive her to the club?"

77.     Ms. Gold's remarks were inappropriate, offensive, targeted, hostile and maliciously intended to upset Plaintiff.

78.     Plaintiff's requests for accommodation have been reasonable, and have been related to accessing the ABERDEEN's website, facilities, services and activities.

79.     Plaintiff never made a request for daily transportation to the clubhouse. She sought only equality of access, not special privileges at ABERDEEN.

80.     Ms. Gold, entitled by her spouse's position on the ABERDEEN Board, angrily contacted Plaintiff, during an election period and admonished her for requesting that the ABERDEEN Board comply with her accessibility requests.

81.     During this phone call, Ms. Gold referred to her as a "prima donna" for making such "annoying" requests of her husband and the other Board members, who had more important issues to consider.

82.     Plaintiff's concerted efforts at obtaining assistance went on for nearly six months and were made based upon ABERDEEN's false assurance that it would "do anything that she asked for" in order to accommodate her.

*Dining Services*

83.     At ABERDEEN's dining facilities, Plaintiff was regularly harassed by staff members and other ABERDEEN club members.

84.     Plaintiff was told she was "*holding up the buffet line*," that "*blind people should not be allowed to use the buffet during peak hours*" as it was "*unfair*" to the other members and that Plaintiff "*should be more considerate of everyone*." Other members chimed in to say, "*we don't need any Mr. Magoo's groping around us on this line.*"

85.     Plaintiff had never heard of Mr. Magoo, but now understands this reference was towards an unintelligent, old, clumsy, blind man, which the intended audience, including staff members, found to be humorous.  The Mr. Magoo cartoon character was introduced in 1960; such references made now, 64 years later, to mock the difficulties faced by visually impaired people are insulting, offensive and directly discriminatory.

86.     Plaintiff felt publicly bullied by these statements and left the Premises in tears.

87.     Mr. Rahgozar and several of his staff members engaged in, and witnessed this incident, laughing audibly, which incited further bullying on the buffet line. Neither Mr. Rahgozar nor any ABERDEEN staff member took any action to assist Plaintiff or to dissuade further bullying.

88.     As a result of ABERDEEN's actions and inactions, the nickname stuck, and Plaintiff has been addressed as "Magoo" by random strangers at ABERDEEN ever since.

89.     Plaintiff was called names like "Blind Girl" and "Mr. Magoo" and her private medical information was dispersed throughout the membership community by Mr. Riegler, Mr. Rahgozar, and Ms. Gold. At times people completely unknown to Plaintiff would approach her asking "*what's it like to be blind?*"

90.     After these events, Plaintiff took the time to write an informative letter to Mr. Riegler, the Board, and the Food and Beverage Staff detailing the acts of discrimination that she suffered in an attempt to educate and dissuade further mistreatment, as Plaintiff hoped their discrimination was done out of ignorance.

91.     However, instead of deterring future discriminatory acts, they were only escalated by ABERDEEN. Due to the discrimination and retaliation, Plaintiff has not been able to return to the Premises since January 2023.

92.     Notwithstanding, ABERDEEN has continued to levy monthly membership dues against Plaintiff's account for the past 21 months, despite knowing that: she fears for her physical safety; is persistently harassed by members and staff; she cannot use the amenities; and, that ABERDEEN has refused to accommodate every one of her reasonable requests that would have enabled her to enjoy her membership.

### *Segregated Seating*

93.     As a reasonable accommodation, Plaintiff requested to be seated "near the buffet, in a well-lit area."

94.     Plaintiff's requests were denied and, instead, Mr. Rahgozar placed her in a separate room where he routinely segregated disabled members because "there were fewer tables with more room between them."

95.     While this room may benefit individuals who require more space to navigate a mobility device between tables, Plaintiff had made a specific request for accommodation, and believed her safety was endangered in an egregiously irresponsible manner by sitting her further from the buffet area and in an area that was less lit.

96.     Not only was Plaintiff seated further away from the buffet, in an entirely different room, but she was further endangered by having to navigate around these heavy motorized mobility devices and the inherent instability of the disabled members who relied upon them.

97.     Further, Plaintiff was seated so far from the buffet table she was only able to safely access very limited food options.

98.     On the second and final occasion that Plaintiff attempted to access the buffet, she was, again, seated in the segregated "disabled room" where she was run over by a heavy-set man who was backing up in a heavy motorized scooter.

99.     Plaintiff was knocked to the ground, had hot food spilled on her bare legs and suffered physical injuries to her right foot and left hip as a result, permanently impacting her gait.

100.    Plaintiff now requires the use of a wheelchair when travelling more than 50 feet. She can barely make it down the driveway to put out her garbage pail each week.

101.    Plaintiff made a third attempt to not be discriminated against by Mr. Rahgozar and was met with the same exact response.

102.    Plaintiff realized that she had been blocked from celebrating Chanukkah at ABERDEEN, and that this intentional, subtle form of discrimination by Mr. Rahgozar was likely to continue.

103.    When she reported the segregated seating issues to Mr. Riegler and the ABERDEEN Board, Plaintiff received no response.

104.    As a result, Plaintiff could not enjoy Chanukkah dinner at ABERDDEN in 2022, and never attempted to make another dining reservation at ABERDEEN again.

105.    Plaintiff was socially rejected, maliciously harassed, physically injured and, ultimately, expelled by ABERDEEN just four months after her membership began.

### *ALLEGATIONS OF RETALIATION BY WATERFORD*

106.    In retaliation for Plaintiff's requests for reasonable accommodations, and in concert with ABERDEEN's Board, whose members lived in WATERFORD, WATERFORD has refused to maintain Plaintiff's Residence as they do for every other resident, creating further safety hazards for Plaintiff and further discriminating against her.

107.    Plaintiff has also been harassed by WATERFORD and WATERFORD's Board members and received death threats at her home.

### *Drainage Issues*

108.    Upon moving into her Residence in September of 2022, Plaintiff discovered a moldy, algae-covered patio, which had become slick and unsafe to walk on.

109.    The odor of the algae growth could be smelled from Plaintiff's kitchen, requiring her to spend hundreds of dollars in pressure washing services to keep the patio clean.

110.    The algae also ruined her teak patio furniture, requiring Plaintiff to expend funds on bi-monthly restoration services for twelve (12) pieces of patio furniture. Twelve (12) newer pieces have been moved to a storage facility, to prevent them from rotting.

111.    Plaintiff additionally noted rainwater overflowing the gutter flashings onto the patio and flooding the lawn behind her unit.

112.    Further, none of the irrigation systems were functioning, requiring Plaintiff to lay soaker hoses for the lawn beds and hand water the remainder of her landscaping.  None of the shrubs she planted survived, and all the prior owner's newly installed shrubs have died.

113.    Plaintiff was forced to expend her own funds to replace all the landscaping throughout her Residence, power washing her patio once per month and refinishing her teak patio

furniture every two months after moving whatever pieces she could fit into her garage. The remainder were moved offsite to a 10' x 20' storage unit, for which Plaintiff must pay monthly.

114.   After repeated attempts to communicate these issues and schedule the necessary assessment and repairs with WATERFORD, no progress was made, and Plaintiff lost the full use of her patio.

115.   The issue of the water seeping onto the patio surface had been ongoing for several years. Prior to Plaintiff's purchase of the Residence, a French drain had been installed under the entire 22-foot length of the patio, however this drain was cracked and failing.

116.   As such, four (4) 12-inch-long grates had been installed over the French drain and were clogged with rocks. Someone had placed sod over them and cut out rectangles that were filled with gravel for drainage.

117.   These were overflowing onto the patio surface, resulting in standing, stagnant water, and were the primary reason for the algae growth that damaged Plaintiff's property.

118.   The standing water attracted breeding mosquitos, which entered Plaintiff's house, requiring her to pay for monthly pest control out of her own funds, which is a service that WATERFORD is required to provide for the 100 properties within the community, but also has never provided to Plaintiff.

119.   Plaintiff discussed these issues with WATERFORD Board Member, Paul Cinnamonte, whose patio adjoins hers and discovered that his property was not affected by the flooding from the lake because the land between his patio and the lake dropped off at a significantly deeper angle than hers, draining some of his flood water into the lake. However, this patio floods onto Plaintiff's patio laterally, and stagnates along the edge of the concrete.

120.    The two agreed that this drainage issue needed to be addressed urgently, as it was likely to worsen.

121.    Mr. Cinnamonte, assured Plaintiff that these issues were brought to WATERFORD Property Manager, Germania Corona, and that he was working on a resolution with her. However, when Plaintiff would attempt to follow up with WATERFORD these issues, she always received a canned response, stating that they were forwarding her message to Ms. Corona. Plaintiff never received a response from Ms. Corona regarding these issues.

122.    Plaintiff is visually impaired as well as immunocompromised and could not continue to slip on her patio and inhale mold spores while she slept.

123.    Out of concern for her safety and desire to mitigate the damages to her property, Plaintiff undertook the expense of correcting the problem with Mr. Cinnamonte's approval.

124.    Plaintiff paid a contractor to raise the edge of her patio with paver stones, as a temporary solution, and notified WATERFORD that an urgent, permanent solution was needed. WATERFORD ignored her.

### *Death Threat*

125.    On March 4, 2024, Plaintiff discovered a typed message taped to her front door.

126.    The message was printed in large font to accommodate Plaintiff's disability.  It read "Aren't you tired... Tired of being a F***ING A***OLE to everyone? Tired of being HATED by everyone that meets you? Do everyone a favor... GO K**L YOURSELF YOU F***ING A***OLE!"

127.    After receiving this note, Plaintiff became concerned for her safety and, as such, contacted the local authorities and submitted a report with the Palm Beach County Sheriff's Office

via Deputy Raymond D. Thomas. Deputy Thomas responded to Plaintiff's home and completed a police report. He reviewed the note and indicated he would conduct an investigation.

128.     At the time, Plaintiff was unable to identify the woman that Plaintiff saw near her property. Plaintiff had never seen the WATERFORD HOA Board members in person. Rather, she had only seen some very old photos which were magnified by Mr. Cinnamonte from WATERFORD's website. Plaintiff has since seen the same woman in person and has reason to believe that WATERFORD HOA Board Member Gloria Miller is responsible for taping the threatening letter to her front door.

### *Bee Swarms*

129.     On the morning of March 14, 2024, another WATERFORD resident, Rose Darien, and her visiting family members, Don Darien (son) and Vincent Toppi (son-in-law) submitted a complaint to WATERFORD regarding a life-threatening swarm of over 3,000 bees that had nested immediately in front of Plaintiff's door.

130.     Plaintiff was only warned of this condition by a UPS driver who was unable to deliver Plaintiff's packages he believed his own life was in danger.

131.     This life-threatening situation required immediate notification, yet neither the Darien's, the Toppi's, Davenport, nor anyone from WATERFORD ever took steps to alert Plaintiff to this dangerous situation.

132.     By choosing to not inform her, WATERFORD endangered Plaintiff's life.

133.     An attack by a swarm of 3,000 bees nesting at her eye level would have likely been fatal to Plaintiff, and anyone else that were to be attacked. Plaintiff, who could not see the bee swarm, unknowingly used that entrance at least ten times before UPS notified her that the dangerous swarm was there.

134.    Of note, Ms. Darien's husband, Albert, previously served as the WATERFORD HOA Board President for several decades before passing away in 2020. As such. The WATERFORD HOA Board members frequented Ms. Darien's property and were often observed monitoring Plaintiff from Ms., Darien's property.  Vincent Toppi was observed by two different contractors using binoculars to watch Plaintiff through her kitchen windows.  He was also observed behind her house, using binoculars, to stalk her inside of her rear bedroom.  When confronted by one of the contractors, Mr. Toppi claimed to be "looking for bees".  A confrontation ensued. These incidents were reported to law enforcement and a report was filed by Palm Beach County Sherif Deputy Raymond D. Thomas.

135.    When Plaintiff went outside to investigate at around 4:30 PM, the Darien's and the Toppi's were all gathered in front of Ms. Darien's garage in lawn chairs, watching to see if she'd be attacked by the swarm.

136.    When Plaintiff asked why WATERFORD and/or the Darien's had not warned her, as Rose Darien, Don Darien and Vincent Toppi have her cell phone number, they had no response.

137.    Mr. Darien informed Plaintiff that they had all decided together to contact WATERFORD instead of contacting her, which Plaintiff found odd given her previous hospitable history with the Darien's.

138.    Walter Doyle, WATERFORD Board Member (at the time) lived one house away from Plaintiff and was often seen recording her when she retrieved her garbage pail.  Now, Plaintiff no longer retrieves her pails and has Cheri Cinnamonte, Mr. Cinnamonte's widow, assist her with this task.

139.    In choosing to notify the property manager only, and not their visually impaired, immunosuppressed neighbor of a life-threatening danger, WATERFORD's (and the Darien's and Toppi's) motive was clearly retaliation.

140.    On March 29, 2024, Plaintiff sent a letter to WATERFORD detailing these events and to date has received no response to her concerns.

## COUNT I – DISABILITY DISCRIMINATION BY ABERDEEN IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

141.    Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 36 above as if fully set forth herein.

142.    On July 26, 1990, Congress enacted the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Title III of the ADA holds as a "general rule" that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

143.    Congress found, among other things, that:

- some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

- historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

- discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

- individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

- the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3), (5) and (9).

144.    Congress explicitly stated that the purpose of the ADA was to:

- provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

- provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

- invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

145.    Commercial enterprises were provided one and a half (1.5) years from enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January

26, 1992, or January 26, 1993 if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. See 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

146.    The term "public accommodation" is defined under the ADA by 12 extensive categories, which legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled." PGA Tour v. Martin, 532 U.S. 661, 676 (2001). These twelve categories are delineated in 42 U.S.C.A. § 12181(7), which provides:

> The following private entities are considered *public accommodations* for purposes of this subchapter, if the operations of such entities affect commerce—
> a.   an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
> b.   *a restaurant, bar, or other establishment serving food or drink;*
> c.   a motion picture house, theater, concert hall, stadium, or *other place of exhibition or entertainment;*
> d.   an auditorium, convention center, lecture hall, or other place of public gathering;
> e.   a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
> f.   a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
> g.   a terminal, depot, or other station used for specified public transportation;
> h.   a museum, library, gallery, or other place of public display or collection;
> i.   a park, zoo, amusement park, or *other place of recreation*;
> j.   a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
> k.   a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
> l.   a gymnasium, health spa, bowling alle*y, golf course, or other place of exercise or recreation*.

42 U.S.C.A. § 12181(7) (*emphasis added).*

147.     As detailed above, ABERDEEN's use of their facilities clearly falls under at least four of the underlined categories above (b, c, i, and l), categorizing it a place of public accommodation subject to Title III of the ADA.

148.     Residential facilities such as ABERDEEN are not "categorically excluded from the definition of "public accommodations." Kalani v. Castle Vill. LLC, 14 F. Supp. 3d 1359, 1370 (E.D. Cal. 2014).

149.     Further, in Kalani, the court determined that even the use of a private residential facility's clubhouse for bingo gatherings that was open to the public and twice-yearly yard sales resulted in the clubhouse, restrooms in the clubhouse, and surrounding parking lot and entranceways being included as "public accommodations" under the ADA. Kalani, 14 F. Supp. 3d at 1370.

150.     The Department of Justice Technical Manual squarely addresses the removal of barriers in residential facilities, such as ABERDEEN, where such areas are open to the public:

> Does title III apply to common areas within residential facilities? Although title III does not apply to strictly residential facilities, it covers places of public accommodation within residential facilities. Thus, areas within multifamily residential facilities that qualify as places of public accommodation are covered by the ADA if use of the areas is not limited exclusively to owners, residents, and their guests.
>
> ILLUSTRATION 1: A private residential apartment complex includes swimming pool for use by apartment tenants and their guests. The complex also sells pool "memberships" generally to the public. The pool qualifies as a place of public accommodation.
>
> ...
>
> ILLUSTRATION 3: A private residential apartment complex contains a rental office. The rental office is a place of public accommodation.

Technical Assistance Manual on the Americans With Disabilities Act, § III-1.2000 (1994).[1] This Department of Justice interpretation regarding public accommodations within residential facilities is consistent with the intent of the ADA in defining public accommodations: "it is critical to define places of public accommodations to include all places open to the public." H.R. Rep. No. 101-485(II), at part 2 of 4 (1990), *reprinted* in 1990 U.S.C.C.A.N. 303.

151.    Pursuant to 42 U.S.C. § 12187, Title III generally exempts private clubs from its coverage. However, the private club exemption contained in the ADA explicitly cross-references the private club exception contained in Title II of the Civil Rights Act ("Title II"), which excludes from this exemption private clubs or establishments that are open to the public.

152.    As evidenced above, the enumerated facilities physically located within ABERDEEN, namely their website, dining and social centers, fitness and aquatics centers, clubhouse, restrooms and locker-rooms, are utilized by non-residents and non-members, can and have been rented out for parties and private events by the same.

153.    ABERDEEN's facilities have been and continue to be used to host regularly scheduled events and activities that are open to the general public.

154.    ABERDEEN does not qualify as a private club to warrant exemption, and is, therefore, subject to Title III of the ADA as a place of public accommodation.

155.    Any member of the public can purchase an ABERDEEN membership. As evidenced above, there are no selectivity requirements other than payment of the membership fees.

---

[1] "The Justice Department's interpretation of its own regulations, such as the Technical Assistance Manual, must also be given substantial deference and will be disregarded on if plainly erroneous or inconsistent with the regulation." *Botosan v. Paul McNally Realty*, 216 F.3d 827, 834 (9th Cir. 2000).

Further, one does not need to be a member in order to enjoy ABERDEEN's facilities, as such facilities remain open to the public.

156.    ABERDEEN knowingly and purposefully allows non-members of the public access to their facilities. It has no security features, barriers such as locked or gated entrances, nor patrolled checkpoints to prevent public access to the club's facilities.  There is no procedure to verify membership or otherwise distinguish from who is an ABERDEEN member, a bona fide guest, or simply a member of the general public, as all are able to wander about the facilities freely. Further, ABERDEEN hosts public events and widely advertises them via it's a public website, social media platforms, and published promotional articles, all of which be viewed and accessed by non-members of the general public.

157.    ABERDEEN solicits, advertises, and sells memberships to the general public on its website, social platforms, and by publishing promotional articles in local and national media, all of which are publicly available.

158.    ABERDEEN is a private not-for-profit corporation.

159.    Pursuant to 42 U.S.C. § 12182(7), 28 C.F.R. § 36.104, the 2010 ADA Standards, and relevant case law, ABERDEEN is a place of public accommodation covered by the ADA and, therefore, must be in compliance therewith.

160.    Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Officer of the Attorney General promulgated Federal Regulations to implement the requirements of the ADA. See 28 C.F.R. § 36 and its successor the 2010 ADA Standards ADA Accessibility guidelines (hereinafter referred to as "ADAAG"), 28 C.F.R. § 36, under which said Department may obtain civil penalties of up to $55,000.00 for the first violation and $110,000.00 for and subsequent violation.

*Physical Barriers in violation of the ADA*

161.    ABERDEEN has discriminated and continues to discriminate against Plaintiff and others who are similarly situated by denying access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations located at ABERDEEN, as prohibited by 42 U.S.C. § 12182 and 42 U.S.C. § 12101 et. seq., and by failing to remove architectural barriers pursuant to 42 U.S.C. § 12182(b)(2)(A)(iv).

162.    Plaintiff has resided at ABERDEEN since September of 2022 and has thereby been forced to repeatedly return to Property and the common elements thereto. Plaintiff has been denied full and safe equal access to the Property and the facilities and therefore suffered an injury in fact.

163.    As a resident, Plaintiff intends to return and would like to be able to use and enjoy the facilities at ABERDEEN on a spontaneous, full and equal basis. However, Plaintiff is precluded from doing so by the ABERDEEN's failure and refusal to provide disabled persons with full and equal access to their facilities. Therefore, Plaintiff continues to suffer from discrimination and injury due to the architectural barriers that are in violation of the ADA.

164.    Based on a preliminary inspection of the Premises, ABERDEEN is discriminating against Plaintiff as a result of, inter alia, the following specific barriers/violations:

I.    **DINING & SOCIAL CENTER – 8251 ABERDEEN DRIVE**

*Disabled Parking and Parking Area*
1) Failure to provide painted sign(s) on the ground for disabled parking in violation of 2010 ADAAG §§ 502 and 502.6.
2) Providing sign(s) for disabled parking that are too low in violation of 2010 ADAAG §§ 502 and 502.6.

*Library/Locker Area (Floor 2)*
3) Failure to provide a coat hook within the proper reach ranges for a person with a disability in violation of 2010 ADAAG §§ 603, 603.4 and 308.
4) Failure to provide an additional accessible toilet compartment complying with 604.8.2 when there are 6 or more water closets or urinals in any combination in violation of 2010 ADAAG §§ 213, 213.3 and 213.3.1.

5) Failure to provide sufficient clear floor space around a water closet without any obstructing elements (trash cans) in this space in violation of 2010 ADAAG §§4.22.3, 603, 603.2.3, 604, 604.3 and 604.3.1.

6) Failure to provide the proper spacing between a grab bar and an object projecting out of the wall in violation of 2010 ADAAG §§ 609, 609.1 and 609.3.

7) Failure to provide toilet paper dispensers in the proper position in front of the water closet or at the correct height above the finished floor in violation of 2010 ADAAG §§ 604, 604.7 and 309.4.

8) Failure to provide the proper insulation or protection for plumbing or other sharp or abrasive objects under a sink or countertop in violation of 2010 ADAAG §§ 606 and 606.5.

***Restroom Floor 1 Near Dining***

9) Providing a gate or door with a continuous opening pressure of greater than 5 lbs. exceeding the limits for a person with a disability in violation of 2010 ADAAG §§ 404, 404.1, 404.2, 404.2.9 and 309.4.

10) Providing grab bars of improper horizontal length or spacing as required along the rear or side wall in violation of 2010 ADAAG §§ 604, 604.5, 604.5.1 and 604.5.2.

11) Failure to provide a coat hook within the proper reach ranges for a person with a disability in violation of 2010 ADAAG §§ 603, 603.4 and 308.

12) Failure to provide operable parts that are functional or are in the proper reach ranges as required for a person with a disability in violation of 2010 ADAAG §§ 309, 309.1, 309.3, 309.4 and 308. (door lock)

13) Failure to provide the correct opening width for a forward approach into lavatory (sink) in violation of 2010 ADAAG §§ 305, 305.7.1, 404, 605.3 and 606.2

***Dining Area Floor 2 – Indoors (Multiple Areas)***

14) Failure to provide seating for a person(s) with a disability that has the correct clear floor space for forward approach in violation of 2010 ADAAG §§ 902, 902.2, 305 and 306.

15) Failure to provide a sufficient amount of seating when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.1, 902, 305 and 306.

16) Failure to provide a sufficient dispersion of seating thought the facility when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.2, 902, 305 and 306.

***Dining Area Floor 1 Outdoors Near Golf Course and Patio Seating***

17) Failure to provide seating for a person(s) with a disability that has the correct clear floor space for forward approach in violation of 2010 ADAAG §§ 902, 902.2, 305 and 306.

18) Failure to provide a sufficient amount of seating when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.1, 902, 305 and 306.

19) Failure to provide a sufficient dispersion of seating thought the facility when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.2, 902, 305 and 306.

### *Bar and Bar Area Indoors*

20) Providing counter heights exceeding 36 inches making it impossible to service a person with a disability in violation of 2010 ADAAG §§ 904, 904.4, 904.4.1, 904.4.2, 305 and 306.

21) Failure to provide accessible seating for person(s) with a disability at a bar or adjacent table in the bar area, recreational area or a table area adjacent to a pool for food or beverage service, or at a computer work surface such as in a business center, in violation of 2010 ADAAG §§ 902, 902.1, 902.2, 902.3, 305, 306 and/or §4.32.4 of the 1991 ADA Standards.

22) Failure to provide seating for a person(s) with a disability that has the correct clear floor space for forward approach in violation of 2010 ADAAG §§ 902, 902.2, 305 and 306.

23) Failure to provide a sufficient amount of seating when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.1, 902, 305 and 306.

### *Restroom Main Lobby*

24) Failure to provide the correct opening width for a forward approach into a lavatory (sink) in violation of 2010 ADAAG §§ 305, 305.7.1, 404, 605.3 and 606.2 (sink)

25) Failure to provide sufficient clear floor space around a water closet without any obstructing elements in this space in violation of 2010 ADAAG §§4.22.3, 603, 603.2.3, 604, 604.3 and 604.3.1. (stall)

26) Failure to provide grab bar(s) in violation of 2010 ADAAG §§ 604, 604.5, 609, 609.4, 609.1 and 609.3.

27) Failure to provide toilet paper dispensers in the proper position in front of the water closet or at the correct height above the finished floor in violation of 2010 ADAAG §§ 604, 604.7 and 309.4.

28) Failure to provide a coat hook within the proper reach ranges for a person with a disability in violation of 2010 ADAAG §§ 603, 603.4 and 308.

### *Unisex Restroom Lobby*

29) Failure to provide a dispenser in an accessible position (back wall or other inaccessible place) so that it can be reached by a person with a disability in violation of 2010 ADAAG §§ 606, 606.1, 308 and 308.2.2.

30) Failure to provide sufficient clear floor space around a water closet without any obstructing elements in this space in violation of 2010 ADAAG §§4.22.3, 603, 603.2.3, 604, 604.3 and 604.3.1. (trash can)

31) Failure to provide paper towel dispenser at the correct height above the finished floor in violation of 2010 ADAAG §§ 606, 606.1 and 308.

32) Failure to provide a coat hook within the proper reach ranges for a person with a disability in violation of 2010 ADAAG §§ 603, 603.4 and 308.

33) Failure to provide shelves at the proper height above the finished floor (min 40 – max 48 inches) in violation of 2010 ADAAG §§ 603 and 603.4.

34) Failure to provide the correct height for a table surface or for a baby changing table, in violation of 2010 ADAAG §§902, 902.1, 902.2, 902.3, and/or §4.32.4 of the 1991 ADA Standards.

## II.   FITNESS & AQUATIC CENTER – 8477 ABERDEEN DRIVE

### *Locker Room Restroom*

1)  Failure to provide proper knee clearance for a person with a disability under a counter or sink element in violation of 2010 ADAAG §§ 306, 306.1 306.3, 606 and 606.2

2)  Failure to provide proper toe clearance for a person with a disability under a counter or sink element in violation of 2010 ADAAG §§ 306, 306.1, 306.2, 306.2.1, 606 and 606.2.

3)  Failure to provide the correct opening width for a forward approach into a urinal, stall door or lavatory (sink) in violation of 2010 ADAAG §§ 305, 305.7.1, 404, 605.3 and 606.2

4)  Failure to provide toilet paper dispensers in the proper position in front of the water closet or at the correct height above the finished floor in violation of 2010 ADAAG §§ 604, 604.7 and 309.4.

5)  Failure to provide a coat hook within the proper reach ranges for a person with a disability in violation of 2010 ADAAG §§ 603, 603.4 and 308.

6)  Failure to provide mirror(s) located above lavatories or countertops at the proper height above the finished floor in violation of 2010 ADAAG §§ 603 and 603.3.

7)  Failure to provide the correct spacing for a forward or parallel approach to an element due to a wall or some other obstruction in violation of 2010 ADAAG §§ 305 and 306.

8)  Failure to provide the proper insulation or protection for plumbing or other sharp or abrasive objects under a sink or countertop in violation of 2010 ADAAG §§ 606 and 606.5.

### *Seating Area near Tennis Courts and Pool*

9)  Failure to provide seating for a person(s) with a disability that has the correct clear floor space for forward approach in violation of 2010 ADAAG §§ 902, 902.2, 305 and 306.

10) Failure to provide a sufficient amount of seating when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.1, 902, 305 and 306.

11) Failure to provide a sufficient dispersion of seating thought the facility when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.2, 902, 305 and 306.

### *Pool #1 Adult*

12) Failure to provide a means of entry at the pool as required for persons with a disability such as a pool lift chair, sloped entry, transfer wall or transfer platform in violation of 2010 ADAAG §§ 242, 242.1, 242.2 and 1009.

### Spa Adjacent to Pool

13) Failure to provide a means of entry at the pool as required for persons with a disability such as a pool lift chair, sloped entry, transfer wall or transfer platform in violation of 2010 ADAAG §§ 242, 242.1, 242.2 and 1009.

### Mixed Use Pool #2

14) Failure to provide a means of entry at the pool as required for persons with a disability such as a pool lift chair, sloped entry, transfer wall or transfer platform in violation of 2010 ADAAG §§ 242, 242.1, 242.2 and 1009.

### Additional Seating Upper Area of Pool

15) Failure to provide seating for a person(s) with a disability that has the correct clear floor space for forward approach in violation of 2010 ADAAG §§ 902, 902.2, 305 and 306.

16) Failure to provide a sufficient amount of seating when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.1, 902, 305 and 306.

17) Failure to provide a sufficient dispersion of seating thought the facility when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.2, 902, 305 and 306.

### Additional Indoor Seating in Building

18) Failure to provide seating for a person(s) with a disability that has the correct clear floor space for forward approach in violation of 2010 ADAAG §§ 902, 902.2, 305 and 306.

19) Failure to provide a sufficient amount of seating when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.1, 902, 305 and 306.

20) Failure to provide a sufficient dispersion of seating thought the facility when dining surfaces are provided for the consumption of food or drink for a person(s) with a disability in violation of 2010 ADAAG §§ 226, 226.2, 902, 305 and 306.

165.    In instance(s) where the 2010 ADAAG standard does not apply, the 1991 ADAAG standard applies, and all of the violations listed in paragraph 146 herein can be applied to the 1991 ADAAG standards.

166.    To the best of Plaintiff's belief and knowledge, ABERDEEN has failed to eliminate the specific violations set forth in paragraph 146 herein.

167.    The ADA also requires reasonable modifications in policies, practices, or procedures, when necessary to afford such goods, services, facilities, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter their nature.

168.    Here, ABERDEEN further violated the ADA by failing to make reasonable modifications in policies, practices, or procedures at the Property and the facilities thereto, when these modifications were necessary to afford these goods, services, facilities, or accommodations.

169.    ABERDEEN had actual knowledge of said violations prior to this Complaint as evidenced by Plaintiff's repeated attempts, both written and verbal, to rectify such violations.

170.    To date, the readily achievable barriers and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

171.    The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

172.    All of the above violations are readily achievable to modify in order to bring Premises or the Facility/Property into compliance with the ADA. The barriers to access which prohibit access to the property and the facilities as outlined in paragraph 146 may result in an expense to ABERDEEN, but in as much as the facility is open to the public, ABERDEEN is still required to undergo this expense. Pursuant to the ADA, 42 U.S.C. § 12101 et. seq., and 28 C.F.R. § 36.304, ABERDEEN was required to make the establishment a place of public accommodation, accessible to persons with disabilities by January 28, 1992. As of the date of the filing of this Complaint, ABERDEEN has failed to comply with this mandate.

173.    Pursuant to 42 U.S.C. § 12188, this Court is vested with the authority to grant Plaintiff's injunctive relief, including an order to alter the subject facility to make them readily accessible to and useable by individuals with disabilities to the extent required by the ADA and closing the Subject Facility until the requisite modifications are completed.

174.    Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendants' Websites because of her disability. She has not been provided services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled persons. Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

175.    Plaintiff attempted to access and/or utilize Defendants' websites, but was unable to, and she continues to be unable to enjoy full and equal access to Defendants' websites and/or understand the content therein because numerous portions of Defendants' websites do not interface with Plaintiff's screen reader software. Specifically, features of Defendants' websites that are inaccessible to Plaintiff's screen reader software include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines):

### *Website Barriers in Violation of the ADA*

176.   Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

177.   Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to ABERDEEN's Website because of her disability. She has not been provided services that are provided to other patrons who are not

disabled, and/or have been provided services that are inferior to the services provided to non-disabled persons. ABERDEEN has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

178.  Plaintiff attempted to access and/or utilize ABERDEEN's Website, but was unable to, and she continues to be unable to enjoy full and equal access to ABERDEEN's Website and/or understand the content therein because numerous portions of ABERDEEN's Website do not interface with Plaintiff's screen reader software. Specifically, features of ABERDEEN's Website that are inaccessible to Plaintiff's screen reader software include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines):

I.  **ABERDEEN WEBSITE** - **https://www.aberdeencountryclub.com/**

*Home Page*
1. The "Skip to Content" link is not available on the website impacting visually impaired users;
2. Menu items are inaccessible to screen reader users causing them difficulty in understanding the content structure of the page content;
3. Layout table announced for screen reader users causing misinterpretation of the table as a data table;
4. Hidden content receives keyboard focus resulting in screen reader users confusion, causing difficulties in them obtaining relevant information;
5. Video plays automatically and simultaneously as the screen reader starts to read the page content, causing users difficulty in accessing the screen content;
6. The "alt" attribute is missing in the source code of the decorative images present in the main content area, causing screen readers to skip the image and preventing users from accessing the image content;
7. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;
8. The non-descriptive links texts announced for screen reader users do not describe the destination causing users to only access the link text and not the surrounding information;
9. The carousel functionality is not identified for screen reader users, preventing visually impaired users from effectively interacting with the carousel and access the related content;
10. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

11. The textual description for informative image links is not provided, resulting in screen reader users not being able to understand the purpose of the interactive image;

12. The main landmark is not defined within the page, preventing screen reader users from navigating to different sections of web page efficiently and causing frustration and difficulty for screen reader users and resulting in a poor overall user experience;

13. The disabled state of several links are not defined for screen reader users, preventing users from being able to interact with those elements effectively;

14. Textual description is incorrect for several informative image links preventing screen reader users from understanding the purpose of the interactive images.

### *Log-in Page*

15. Several form controls rely on placeholder text as their visible label, making them inaccessible to screen readers;

16. The disabled state of certain buttons is not defined for screen reader users, preventing users from interacting with such elements effectively;

17. When users submit the incorrect form details, error messages are not announced by the screen reader preventing users from being aware of the occurrence of errors on the page and effectively accessing error messages;

18. Checkbox content is not announced by screen reader preventing users from accessing page functionality;

### *Welcome Page*

19. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

20. The textual description for informative image links is not provided, resulting in screen reader users not being able to understand the purpose of the interactive image;

21. Layout table announced for screen reader users causing misinterpretation of the table as a data table;

22. The carousel functionality is not identified for screen reader users, preventing visually impaired users from effectively interacting with the carousel and access the related content;

23. The functionality of the custom tabs in the main content area page is unclear for screen reader users, preventing them from interacting with such elements effectively;

24. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

25. There is no mechanism provided (i.e. play/pause functionality) to control moving content, causing users difficulty in accessing the screen content;

### *My Profile Page*

26. The explicit association is missing for certain form controls preventing users with visual impairments from accessing and interacting with these elements effectively;

27. The keyboard shortcut is missing for certain interactive elements making it impossible for visually impaired users who use keyboard navigation from accessing and interacting with the web page effectively;

28. Certain headings are not announced by screen reader preventing users from accessing page functionality;

### *Reserve a Table Page*

29. The non-descriptive links texts announced for screen reader users do not describe the destination causing users to only access the link text and not the surrounding information;

30. Keyboard support is missing for calendar controls in the main content area, causing difficulty for users with visual and mobility impairments who rely on a keyboard to access images;

31. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

### *Book a Court*

32. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

### *Event Photos Page*

33. Keyboard support is missing for the interactive images within the carousel causing difficulty for users with visual and mobility impairments who rely on a keyboard to access images;

34. The carousel functionality is not identified for screen reader users, preventing visually impaired users from effectively interacting with the carousel and access the related content;

35. The explicit association is missing for certain form controls in the main content area preventing users with visual impairments from accessing and interacting with these elements effectively;

### *Member Directory Page*

36. The current states of certain links are undefined within the main content area, preventing screen readers from identifying text thereby resulting in users not being able to access the functionality associated with such elements;

37. Role presentation used on the data table preventing screen readers from reading the table communication in a linear order and causing users to be unable to understand table functionality and content;

38. Heading text not announced for screen readers preventing users from understanding the purpose of each web page section;

### *Golf Page*

39. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

40. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

41. The disabled states of several links are not defined for screen reader users, preventing users from being able to interact with those elements effectively;

42. The functionality of the custom tabs in the main content area page is unclear for screen reader users, preventing them from interacting with such elements effectively;

43. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

44. The carousel functionality is not identified for screen reader users, preventing visually impaired users from effectively interacting with the carousel and access the related content;

### Racquet Sports Page

45. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

46. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

47. The functionality of the custom tabs in the main content area page is unclear for screen reader users, preventing them from interacting with such elements effectively;

48. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

49. The carousel functionality is not identified for screen reader users, preventing visually impaired users from effectively interacting with the carousel and access the related content;

### Fitness & Aquatics Page

50. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

51. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

52. The functionality of the custom tabs in the main content area page is unclear for screen reader users, preventing them from interacting with such elements effectively;

53. Certain headings are not announced by screen reader preventing users from accessing page functionality;

54. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

### Bocce Page

55. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

56. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

57. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

58. The disabled states of several links are not defined for screen reader users, preventing users from being able to interact with those elements effectively;

### Dining Page

59. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

60. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

61. The functionality of the custom tabs in the main content area page is unclear for screen reader users, preventing them from interacting with such elements effectively;

62. The disabled states of several links are not defined for screen reader users, preventing users from being able to interact with those elements effectively;

### Social Page

63. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

64. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

65. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

66. The carousel functionality is not identified for screen reader users, preventing visually impaired users from effectively interacting with the carousel and access the related content;

### Governance Page

67. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

68. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively;

69. Decorative images within image links have unnecessary alternative text, causing screen readers to announce unnecessary information for users with visual impairments;

70.  The functionality of the custom tabs in the main content area page is unclear for screen reader users, preventing them from interacting with such elements effectively;

71. The disabled states of several links are not defined for screen reader users, preventing users from being able to interact with those elements effectively;

### Our Employees Page

72.  The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

### Houseguest Pass Page

73. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

74. Keyboard support is missing for calendar controls in the main content area, causing difficulty for users with visual and mobility impairments who rely on a keyboard to access images;

### Statement Page

75. The heading structures are incorrectly defined, preventing screen reader users from understanding the webpage structure;

### Calendar

76. Certain headings are not announced by screen reader preventing users from accessing page functionality and understanding web page purpose;

77. Keyboard support is missing for calendar controls in the main content area, causing difficulty for users with visual and mobility impairments who rely on a keyboard to access images;

78. Role presentation used on the data table preventing screen readers from reading the table communication in a linear order and causing users to be unable to understand table functionality and content;

79. Related information is not marked as list items which visually look like a list, causing screen readers difficulty in navigating such lists and different list items effectively.

These accessibility barriers significantly impact usability for people with disabilities and violate WCAG standards, highlighting the need for remedial actions to ensure compliance with ADA requirements.

179.   There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other business entities in making their websites accessible. Incorporating such basic components

to make the ABERDEEN's Website accessible would neither fundamentally alter the nature of ABERDEEN's business nor would it result in an undue burden to ABERDEEN.

180.     ABERDEEN thus have failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

181.     There is a physical nexus between ABERDEEN's Website and the ABERDEEN's Dining & Social Center and ABERDEEN'S Fitness and Aquatic Center in that website is an integral aspect of resident life as it is the only means through which members are provided access to events and activity schedules, registration for events, activities, classes, and services, and processing payments.

182.     To the best of Plaintiff's belief and knowledge, ABERDEEN has failed to eliminate the specific violations set forth in paragraph 160 herein. As a result, ABERDEEN has violated the ADA -- and continues to violate the ADA -- by denying access to ABERDEEN's Website by individuals, such as Plaintiff, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the ABERDEEN's Website are ongoing.

183.     Although ABERDEEN is charged with having knowledge of the violations, ABERDEEN may not have actual knowledge of said violations until this Complaint makes ABERDEEN aware of same.

184.     As a direct and proximate result of ABERDEEN's failure to provide an ADA compliant Website, with a nexus to its ABERDEEN's Clubhouse and services rendered, Plaintiff

has suffered an injury in fact by being denied full access to and enjoyment of ABERDEEN's Clubhouse and services rendered.

185.    Because of the inadequate development and administration of the Defendants' Websites, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

186.    As a further direct and proximate result of Defendant's conduct, Plaintiff has been damaged.

187.    Plaintiff has retained the undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205.

<b><u>COUNT II – DISABILITY DISCRIMINATION BY ABERDEEN<br>IN VIOLATION OF THE FAIR HOUSING ACT</u></b>

188.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, 32 through 36, 48 through 58, 164, and 178 as if fully set forth herein.

189.    The FHA prohibits discrimination against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. 42 U.S.C. § 3604(f)(2)(a) (emphasis added).

190.    The FHA defines discrimination to include a refusal to make reasonable modifications of existing premises if such modifications may be necessary to afford a disabled person full enjoyment of the premises. 42 U.S.C. § 3604(f)(3)(A).

191.    Discrimination under the FHA also includes the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be

necessary to afford disabled persons equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

192.     Plaintiff's Residence is a "dwelling" under the FHA because it is intended for occupancy as a residence by one or more families. 42 U.S.C. § 3602(b).

193.     As set forth above, Plaintiff is disabled within the meaning of the FHA and, as such, falls within a protected class.

194.     ABERDEEN knew or should have known that Plaintiff was a disabled person under the FHA, as Plaintiff disclosed the extent of her limitations due to her disabilities to ABERDEEN on multiple occasions both verbally and in writing.

195.     ABERDEEN has discriminated and continues to discriminate against Plaintiff and others who are similarly situated by denying access to the full and equal provision of services and facilities in connection with Plaintiff's Residence, as prohibited by 42 U.S.C. § 3604(f)(2)(a).

196.     As outlined in paragraph 160, ABERDEEN's website is incompatible with screen readers, making it completely inaccessible to the Plaintiff.

197.     After discovering ABERDEEN's websites deficiencies, Plaintiff informed ABERDEEN; however, ABERDEEN made no efforts to make its website accessible to Plaintiff.

198.     AERDEEN's refusal to provide such accommodation prevented Plaintiff's access to ABERDEEN's facilities and amenities as evidenced above and further precluded Plaintiff from participating in ABERDEEN's HOA board member election, and review of ABERDEEN's amended bylaws.

199.     ABERDEEN's conduct constitutes discrimination on the basis of disability, as ABERDEEN prevented Plaintiff from enjoying the same rights as all non-disabled members in the provision of services and facilities in connection to Plaintiff's Residence.

200.     ABERDEEN's actions constitute an ongoing and continuous violation of the FHA and unless restrained from doing so, ABERDEEN will continue to violate the FHA.

201.     As a direct and proximate result of ABERDEEN's discrimination, Plaintiff has suffered irreparable loss and injury, including but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability status.

202.     Under 42 U.S.C. § 3613, a court may enjoin such discriminatory practice, and award the aggrieved party actual and punitive damages, reasonable attorney's fees, and costs.

## COUNT III – DISABILITY DISCRIMINATION BY WATERFORD IN VIOLATION OF THE FAIR HOUSING ACT

203.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, and 32 through 54 above as if fully set forth herein.

204.     The FHA prohibits discrimination against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. 42 U.S.C. § 3604(f)(2)(a) (emphasis added).

205.     The FHA defines discrimination to include a refusal to make reasonable modifications of existing premises if such modifications may be necessary to afford a disabled person full enjoyment of the premises. 42 U.S.C. § 3604(f)(3)(A).

206.     Discrimination under the FHA also includes the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford disabled persons equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

207.     Plaintiff's Residence is a "dwelling" under the FHA because it is intended for occupancy as a residence by one or more families. 42 U.S.C. § 3602(b).

208.     As set forth above, Plaintiff is disabled within the meaning of the FHA and, as such, falls within a protected class.

209.     WATERFORD knew or should have known that Plaintiff was a disabled person under the FHA, as Plaintiff disclosed the extent of her limitations due to her disabilities to WATERFORD on multiple occasions both verbally and in writing.

210.     WATERFORD has discriminated and continues to discriminate against Plaintiff and others who are similarly situated by denying access to the full and equal provision of services and facilities in connection with Plaintiff's Residence, as prohibited by 42 U.S.C. § 3604(f)(2)(a).

211.     As outlined above, WATERFORD's website is incompatible with screen readers, making it completely inaccessible to the Plaintiff.

212.     Features of WATERFORD'S website that are inaccessible to Plaintiff's screen reader software include, but are not limited to, the following:

    a.  Screen reader is unable to announce PDFs/forms on the "Forms and Documents" page, preventing visually impaired users from accessing information within the PDFs and leading to a lack of necessary information and inability to perform tasks;

    b.  Screen reader is unable to announce PDFs/forms on the "Driveway Regulations" page, preventing visually impaired users from understanding and/or navigating the forms, leading to frustration and inability to complete tasks;

    c.  Screen reader is unable to announce PDFs/forms on the "Sales and Lease" page, under Community Guidelines, preventing visually impaired users from accessing

important information, causing difficulties in understanding sales and lease information;

d.  Screen reader is unable to call out elements and navigate the gallery on the "Preferred Vendors" page properly, preventing visually and mobility impaired users from navigating or understanding the gallery content, leading to a poor user experience;

e.  Screen reader is unable to call out elements accurately on the "Comcast Information," page, causing visually impaired users to face difficulties in understanding and navigating the page, leading to frustration and potential miscommunication;

f.  Screen reader cannot properly read labels on the "Contact Us" page, and required fields are not indicated, causing disabled users to struggle to fill out forms correctly, leading to potential miscommunication and frustration;

g.  Screen reader cannot access information about vehicle regulations on the "Vehicles in Waterford" page, preventing users from accessing important information about vehicle regulations, leading to potential violations;

h.  Screen reader cannot access financial information on the "Financials" page, preventing visually impaired users from accessing financial information, leading to potential misunderstandings;

i.  Screen reader cannot access gate and visitor management information on the "Gate/Visitor Management" page, causing users difficulties in managing gate and visitor access, leading to potential security issues;

j.  Screen reader cannot describe the images properly on the "Landscaping" page due to missing alt tags, preventing users with visual impairments from understanding the context or content of the images, leading to confusion'

k.  Screen reader unable to announce PDFs/forms on the "Driveway Regulations" page, preventing visually impaired users from understanding or navigating the forms, leading to frustration and inability to complete tasks; and

l.  Screen reader cannot identify board members on the "Board & Committees page due to missing alt text and ARIA labels, preventing visually impaired users from identifying board members, leading to lack of clarity.

213.  After discovering WATERFORD's website deficiencies, Plaintiff informed WATERFORD; however, WATERFORD made no efforts to make its website accessible to Plaintiff.

214.  WATERFORD's refusal to provide such accommodation prevented Plaintiff's access to WATERFORD facilities and amenities as evidenced above and further precluded Plaintiff from participating in WATERFORD's HOA board member elections.

215.  Additionally, Plaintiff is prevented from fully accessing WATERFORD's swimming pool, as the means of entrance is in completely inaccessible to visually impaired individuals.

216.  WATERFORD's conduct constitutes discrimination on the basis of disability, as WATERFORD prevented Plaintiff from enjoying the same rights as all non-disabled members in the provision of services and facilities in connection to Plaintiff's Residence.

217.  WATERFORD's actions constitute an ongoing and continuous violation of the FHA and unless restrained from doing so, WATERFORD will continue to violate the FHA.

218.    As a direct and proximate result of WATERFORD's discrimination, Plaintiff has suffered irreparable loss and injury, including but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability status.

219.    Under 42 U.S.C. § 3613, a court may enjoin such discriminatory practice, and award the aggrieved party actual and punitive damages, reasonable attorney's fees, and costs.

## COUNT IV – DISABILITY DISCRIMINATION BY ABERDEEN IN VIOLATION OF THE FLORIDA FAIR HOUSING ACT

220.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, 32 through 36, 48 through 58, 164, and 178 above as if fully set forth herein.

221.    The FLFHA prohibits discrimination against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. Fla. Stat. § 760.23(2). (emphasis added).

222.    The FLFHA defines discrimination to include a refusal to permit reasonable modifications of existing premises occupied or to be occupied by a disabled person if such modifications may be necessary to afford such person full enjoyment of the premises. Fla. Stat. § 760.23(9)(a).

223.    Discrimination under the FLFHA also includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford disabled persons equal opportunity to use and enjoy a dwelling. § 760.23(9)(b).

224.    Plaintiff's Residence is a "dwelling" under the FLFHA because it is intended for occupancy as a residence by one or more families. Fla. Stat. § 760.22(5).

225.    As set forth above, Plaintiff is a member of protected classes under the FLFHA based on disability and, as such, is an aggrieved party.

226.     ABERDEEN knew or should have known that Plaintiff was a disabled person under the FHA, as Plaintiff disclosed the extent of her limitations due to her disabilities to ABERDEEN on multiple occasions both verbally and in writing.

227.     ABERDEEN has discriminated and continues to discriminate against Plaintiff and others who are similarly situated by denying access to the full and equal provision of services and facilities in connection with Plaintiff's Residence, as prohibited by Fla. Stat. § 760.23(2).

228.     As outlined above, both ABERDEEN's website is incompatible with screen readers, making them completely inaccessible to the Plaintiff.

229.     After discovering ABERDEEN's websites deficiencies, Plaintiff informed ABERDEEN; however, ABERDEEN made no efforts to make its website accessible to Plaintiff.

230.     ABERDEEN's refusal to provide such accommodation prevented Plaintiff's access to its facilities and amenities as evidenced above and further precluded Plaintiff from participating in ABERDEEN's HOA board member elections and review of ABERDEEN's amended bylaws.

231.     ABERDEEN's conduct constitutes discrimination on the basis of disability, it prevented Plaintiff from enjoying the same rights as all non-disabled members in the provision of services and facilities in connection to Plaintiff's Residence.

232.     ABERDEEN's conduct constitutes an ongoing and continuous violation of the FLFHA and unless restrained from doing so, ABERDEEN will continue to violate the FLFHA.

233.     As a direct and proximate result of ABERDEEN's discrimination, Plaintiff has suffered irreparable loss and injury, including but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability status.

234.    Under Fla. Stat. § 760.35(4), a court may enjoin such discriminatory practice, and award the aggrieved party actual and punitive damages, reasonable attorney's fees, and costs.

## COUNT V – DISABILITY DISCRIMINATION BY WATERFORD IN VIOLATION OF THE FLORIDA FAIR HOUSING ACT

235.    Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, and 32 through 54 above as if fully set forth herein.

236.    The FLFHA prohibits discrimination against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability. Fla. Stat. § 760.23(2). (emphasis added).

237.    The FLFHA defines discrimination to include a refusal to permit reasonable modifications of existing premises occupied or to be occupied by a disabled person if such modifications may be necessary to afford such person full enjoyment of the premises. Fla. Stat. § 760.23(9)(a).

238.    Discrimination under the FLFHA also includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford disabled persons equal opportunity to use and enjoy a dwelling. § 760.23(9)(b).

239.    Plaintiff's Residence is a "dwelling" under the FLFHA because it is intended for occupancy as a residence by one or more families. Fla. Stat. § 760.22(5).

240.    As set forth above, Plaintiff is a member of protected classes under the FLFHA based on disability and, as such, is an aggrieved party.

241.    WATERFORD knew or should have known that Plaintiff was a disabled person under the FHA, as Plaintiff disclosed the extent of her limitations due to her disabilities to WATERFORD on multiple occasions both verbally and in writing.

242.     WATERFORD has discriminated and continues to discriminate against Plaintiff and others who are similarly situated by denying access to the full and equal provision of services and facilities in connection with Plaintiff's Residence, as prohibited by Fla. Stat. § 760.23(2).

243.     As outlined above, WATERFORD's website is incompatible with screen readers, making it completely inaccessible to the Plaintiff.

244.     Features of WATERFORD'S website that are inaccessible to Plaintiff's screen reader software include, but are not limited to, the following:

a.   Screen reader is unable to announce PDFs/forms on the "Forms and Documents" page, preventing visually impaired users from accessing information within the PDFs and leading to a lack of necessary information and inability to perform tasks;

b.   Screen reader is unable to announce PDFs/forms on the "Driveway Regulations" page, preventing visually impaired users from understanding and/or navigating the forms, leading to frustration and inability to complete tasks;

c.   Screen reader is unable to announce PDFs/forms on the "Sales and Lease" page, under Community Guidelines, preventing visually impaired users from accessing important information, causing difficulties in understanding sales and lease information;

d.   Screen reader is unable to call out elements and navigate the gallery on the "Preferred Vendors" page properly, preventing visually and mobility impaired users from navigating or understanding the gallery content, leading to a poor user experience;

e.   Screen reader is unable to call out elements accurately on the "Comcast Information," page, causing visually impaired users to face difficulties in

understanding and navigating the page, leading to frustration and potential miscommunication;

f.   Screen reader cannot properly read labels on the "Contact Us" page, and required fields are not indicated, causing disabled users to struggle to fill out forms correctly, leading to potential miscommunication and frustration;

g.   Screen reader cannot access information about vehicle regulations on the "Vehicles in Waterford" page, preventing users from accessing important information about vehicle regulations, leading to potential violations;

h.   Screen reader cannot access financial information on the "Financials" page, preventing visually impaired users from accessing financial information, leading to potential misunderstandings;

i.   Screen reader cannot access gate and visitor management information on the "Gate/Visitor Management" page, causing users difficulties in managing gate and visitor access, leading to potential security issues;

j.   Screen reader cannot describe the images properly on the "Landscaping" page due to missing alt tags, preventing users with visual impairments from understanding the context or content of the images, leading to confusion'

k.   Screen reader unable to announce PDFs/forms on the "Driveway Regulations" page, preventing visually impaired users from understanding or navigating the forms, leading to frustration and inability to complete tasks; and

l.   Screen reader cannot identify board members on the "Board & Committees page due to missing alt text and ARIA labels, preventing visually impaired users from identifying board members, leading to lack of clarity.

245.   After discovering WATERFORD's website deficiencies, Plaintiff informed WATERFORD; however, WATERFORD made no efforts to make its website accessible to Plaintiff.

246.   WATERFORD's refusal to provide such accommodation prevented Plaintiff's access to its facilities and amenities as evidenced above and further precluded Plaintiff from participating in WATERFORD's HOA board member elections.

247.   Additionally, Plaintiff is prevented from fully accessing WATERFORD's swimming pool, as the means of entrance is in completely inaccessible to visually impaired individuals.

248.   WATERFORD's conduct constitutes discrimination on the basis of disability, as WATERFORD prevented Plaintiff from enjoying the same rights as all non-disabled members in the provision of services and facilities in connection to Plaintiff's Residence.

249.   WATERFORD's conduct constitutes an ongoing and continuous violation of the FLFHA and unless restrained from doing so, WATERFORD will continue to violate the FLFHA.

250.   As a direct and proximate result of WATERFORD's discrimination, Plaintiff has suffered irreparable loss and injury, including but not limited to actual damages, humiliation, emotional distress, and deprivation of the right to equal housing opportunities regardless of disability status.

251.   Under Fla. Stat. § 760.35(4), a court may enjoin such discriminatory practice, and award the aggrieved party actual and punitive damages, reasonable attorney's fees, and costs.

## COUNT VI - RETALIATION BY ABERDEEN
## IN VIOLATION OF THE FAIR HOUSING ACT

252.   Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, 32 through 36, 48 through 105, 164, and 178 above as if fully set forth herein.

253.    The FHA prohibits interference with any person in exercising their rights under the FHA. 42 U.S.C. §3617.

254.    Section 3617 has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.

255.    Plaintiff had a right at all relevant times to the use and enjoyment of her Residence and the Premises as described herein.

256.    Plaintiff had a right, at all relevant times, to not be discriminated against on the basis of her disability or on the basis of her requests for accommodation therefore, in the provisions of services, amenities, and facilities to her dwelling by ABERDEEN.

257.    ABERDEEN was personally involved, and/or authorized or ratified each and every discriminatory act and denial of accommodation for Plaintiff herein.

258.    Shortly after Plaintiff began making requests for accommodation to enable her to access ABERDEEN's facilities as well as the entitled privileges of her membership therewith, ABERDEEN began an onslaught of harassing, retaliatory and discriminatory conduct against her.

259.    Specifically, ABERDEEN vehemently ignored basic and essential maintenance requests, resorting to, instead, harassing, threatening, and intimidating Plaintiff.

260.    Additionally, ABERDEEN intentionally failed to communicate life-threatening circumstances which created further safety hazards for Plaintiff, as well as important HOA information.

261.    Further, ABERDEEN did nothing to prevent their residents from harassing, threatening, or otherwise interfering with Plaintiff's ability to live peacefully.

262.    Despite the clear instructions of the FHA and the broad application discussed above, ABERDEEN and its board members have personally performed the above referenced

discriminatory and retaliatory conduct and additionally enabled residents of ABERDEEN to engage in similar conduct which collectively has denied Plaintiff her ability to live peacefully in her own home and her basic enjoyment of her fair housing rights.

263.     All of the actions by ABERDEEN as alleged herein were part of a pattern of intentional conduct that violated 42 U.S.C. § 3617 and were motivated by ABERDEEN's animus towards Plaintiff as a result of her disability and her requests for accommodations, therefore.

264.     At all relevant times, ABERDEEN has engaged in a pattern of harassment, retaliation, and discrimination against Plaintiff, which amount to threatening, intimidating or interfering within the meaning of 42 U.S.C. §3617 and its associated regulations.

265.     ABERDEEN's actions herein have proximately caused Plaintiff to suffer damages which the FHA was enacted to ameliorate.

266.     This harassment, retaliation, discrimination, coercion, intimidation, and interference has forced Plaintiff to seek legal counsel to defend against such actions, and ultimately has resulted in the retaining of the undersigned counsel to bring this action.

**COUNT VII - RETALIATION BY WATERFORD
IN VIOLATION OF THE FAIR HOUSING ACT**

267.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, 32 through 54, and 106 through 140 above as if fully set forth herein.

268.     The FHA prohibits interference with any person in exercising their rights under the FHA. 42 U.S.C. §3617.

269.     Section 3617 has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.

270.     Plaintiff had a right at all relevant times to the use and enjoyment of her Residence and the Premises as described herein.

271.    Plaintiff had a right, at all relevant times, to not be discriminated against on the basis of her disability or on the basis of her requests for accommodation therefore, in the provisions of services, amenities, and facilities to her dwelling by WATERFORD.

272.    WATERFORD was personally involved, and/or authorized or ratified each and every discriminatory act and denial of accommodation for Plaintiff herein.

273.    Shortly after Plaintiff began making requests for accommodation to enable her to access WATERFORD's facilities as well as the entitled privileges of her membership therewith, ABERDEEN began an onslaught of harassing, retaliatory and discriminatory conduct against her.

274.    Specifically, WATERFORD vehemently ignored basic and essential maintenance requests, resorting to, instead, harassing, threatening, and intimidating Plaintiff.

275.    Additionally, WATERFORD intentionally failed to communicate life-threatening circumstances which created further safety hazards for Plaintiff, as well as important HOA information.

276.    Further, WATERFORD did nothing to prevent their residents from harassing, threatening, or otherwise interfering with Plaintiff's ability to live peacefully.

277.    Despite the clear instructions of the FHA and the broad application discussed above, WATERFORD and its board members have personally performed the above referenced discriminatory and retaliatory conduct and additionally enabled residents of WATERFORD to engage in similar conduct which collectively has denied Plaintiff her ability to live peacefully in her own home and her basic enjoyment of her fair housing rights.

278.    All of the actions by WATERFORD as alleged herein were part of a pattern of intentional conduct that violated 42 U.S.C. § 3617 and were motivated by WATERFORD's animus towards Plaintiff as a result of her disability and her requests for accommodations, therefore.

279.    At all relevant times, WATERFORD has engaged in a pattern of harassment, retaliation, and discrimination against Plaintiff, which amount to threatening, intimidating or interfering within the meaning of 42 U.S.C. §3617 and its associated regulations.

280.    WATERFORD's actions herein have proximately caused Plaintiff to suffer damages which the FHA was enacted to ameliorate.

281.    This harassment, retaliation, discrimination, coercion, intimidation, and interference has forced Plaintiff to seek legal counsel to defend against such actions, and ultimately has resulted in the retaining of the undersigned counsel to bring this action.

## COUNT VIII – RETALIATION BY ABERDEEN
## IN VIOLATION OF THE FLORIDA FAIR HOUSING ACT

282.    Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, 32 through 36, and 48 through 105 above as if fully set forth herein.

283.    The FLFHA prohibits the interference with any person in exercising their rights under the FLFHA.  Fla. Stat. § 760.37.

284.    Section 760.37 has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.

285.    Plaintiff had a right at all relevant times to the use and enjoyment of her Residence and the Premises as described herein.

286.    Plaintiff had a right, at all relevant times, to not be discriminated against on the basis of her disability or on the basis of her requests for accommodation therefore, in the provisions of services, amenities, and facilities to her dwelling by ABERDEEN.

287.    ABERDEEN was personally involved, and/or authorized or ratified each and every discriminatory act and denial of accommodation for Plaintiff herein.

288.     Shortly after Plaintiff began making requests for accommodation to enable her to access ABERDEEN'S facilities as well as the entitled privileges of her membership therewith, Defendants began an onslaught of harassing, retaliatory and discriminatory conduct against her.

289.     Specifically, ABERDEEN vehemently ignored basic and essential maintenance requests, resorting to, instead, harassing, threatening, and intimidating Plaintiff.

290.     Additionally, ABERDEEN intentionally failed to communicate life-threatening circumstances which created further safety hazards for Plaintiff, as well as important HOA information.

291.     Further, ABERDEEN did nothing to prevent their residents from harassing, threatening, or otherwise interfering with Plaintiff's ability to live peacefully.

292.     Despite the clear instructions of the FLFHA and the broad application discussed above, ABERDEEN and its board members have personally performed the above referenced discriminatory and retaliatory conduct and additionally enabled residents of ABERDEEN to engage in similar conduct which collectively has denied Plaintiff her ability to live peacefully in her own home and her basic enjoyment of her fair housing rights.

293.     All of the actions by ABERDEEN as alleged herein were part of a pattern of intentional conduct that violated Fla. Stat. § 760.37and were motivated by ABERDEEN's animus towards Plaintiff as a result of her disability and her requests for accommodations, therefore.

294.     At all relevant times, ABERDEEN has engaged in a pattern of harassment, retaliation, and discrimination against Plaintiff, which amount to threatening, intimidating or interfering within the meaning of Fla. Stat. § 760.37 and its associated regulations.

295.     ABERDEEN's actions herein have proximately caused Plaintiff to suffer damages which the FLFHA was enacted to ameliorate.

296.     This harassment, retaliation, discrimination, coercion, intimidation, and interference has forced Plaintiff to seek legal counsel to defend against such actions, and ultimately has resulted in the retaining of the undersigned counsel to bring this action.

### COUNT IX – RETALIATION BY WATERFORD
### IN VIOLATION OF THE FLORIDA FAIR HOUSING ACT

297.     Plaintiff adopts and re-alleges the allegations stated in paragraphs 1 through 21, 32 through 54, and 106 through 140 above as if fully set forth herein.

298.     The FLFHA prohibits the interference with any person in exercising their rights under the FLFHA.  Fla. Stat. § 760.37.

299.     Section 760.37 has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.

300.     Plaintiff had a right at all relevant times to the use and enjoyment of her Residence and the Premises as described herein.

301.     Plaintiff had a right, at all relevant times, to not be discriminated against on the basis of her disability or on the basis of her requests for accommodation therefore, in the provisions of services, amenities, and facilities to her dwelling by WATERFORD.

302.     WATERFORD was personally involved, and/or authorized or ratified each and every discriminatory act and denial of accommodation for Plaintiff herein.

303.     Shortly after Plaintiff began making requests for accommodation to enable her to access WATERFORD's facilities as well as the entitled privileges of her membership therewith, Defendants began an onslaught of harassing, retaliatory and discriminatory conduct against her.

304.     Specifically, WATERFORD vehemently ignored basic and essential maintenance requests, resorting to, instead, harassing, threatening, and intimidating Plaintiff.

305.    Additionally, WATERFORD intentionally failed to communicate life-threatening circumstances which created further safety hazards for Plaintiff, as well as important HOA information.

306.    Further, WATERFORD did nothing to prevent their residents from harassing, threatening, or otherwise interfering with Plaintiff's ability to live peacefully.

307.    Despite the clear instructions of the FLFHA and the broad application discussed above, Defendants and their board members have personally performed the above referenced discriminatory and retaliatory conduct and additionally enabled residents of WATERFORD to engage in similar conduct which collectively has denied Plaintiff her ability to live peacefully in her own home and her basic enjoyment of her fair housing rights.

308.    All of the actions by WATERFORD as alleged herein were part of a pattern of intentional conduct that violated Fla. Stat. § 760.37and were motivated by Defendants' animus towards Plaintiff as a result of her disability and her requests for accommodations, therefore.

309.    At all relevant times, WATERFORD has engaged in a pattern of harassment, retaliation, and discrimination against Plaintiff, which amount to threatening, intimidating or interfering within the meaning of Fla. Stat. § 760.37 and its associated regulations.

310.    WATERFORD's actions herein have proximately caused Plaintiff to suffer damages which the FLFHA was enacted to ameliorate.

311.    This harassment, retaliation, discrimination, coercion, intimidation, and interference has forced Plaintiff to seek legal counsel to defend against such actions, and ultimately has resulted in the retaining of the undersigned counsel to bring this action.

## PRAYER FOR RELIEF – COUNT I
## ADA COUNT AGAINST ABERDEEN

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendant,

ABERDEEEN, for the following relief:

### *Physical Barriers*

a.  A declaration that the Premises owned, operated and/or controlled by Defendants is in violation of the ADA;

b.  An Order requiring Defendant, ABERDEEN, to alter its facilities to make them accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA;

c.  An Order directing Defendant, ABERDEEN, to evaluate and neutralize its policies, practices and procedures toward persons with disabilities, for such reasonable time so as to allow ABERDEEN to undertake and complete corrective procedures to the Premises;

### *Website Barriers*

d.  A declaration that ABERDEEN's website is in violation of the ADA;

e.  An Order requiring ABERDEEN, by a specified date, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access its website and effectively communicate with its website to the full extent required by Title III of the ADA;

f.  An Order requiring ABERDEEN, by a specified date, to clearly display the universal disabled logo within its website wherein the logo would lead to a page which would state ABERDEEN accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of ABERDEEN's website;

g.  An Order requiring ABERDEEN, by a specified date, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

h.  An Order directing ABERDEEN, by a specified date, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow ABERDEEN to undertake and complete corrective procedures to ABERDEEN's website;

i.  An Order directing ABERDEEN, by a specified date, to establish a policy of web accessibility and accessibility features for ABERDEEN's website to ensure effective communication for individuals who are visually disabled;

j.  An Order requiring, by a specified date, that any third-party vendors who participate on ABERDEEN's website to be fully accessible to the visually disabled;

k.  An Order directing ABERDEEN, by a specified date and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, the website on how to conform all

web content and services with ADA accessibility requirements and applicable accessibility guidelines;

l.  An Order directing ABERDEEN, by a specified date and at least once every three months thereafter, to conduct automated accessibility tests of ABERDEEN's website to identify any instances where ABERDEEN's website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing ABERDEEN to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

m.  An Order directing ABERDEEN, by a specified date, to make publicly available and directly link from ABERDEEN's website's homepage, a statement of their Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of the website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

n.  An award to Plaintiff of her reasonable attorney's fees, costs, and expenses; and

o.  Such other and further relief as the Court deems just and equitable.

## <u>PRAYER FOR RELIEF – COUNTS II through V</u>
## <u>FHA and FLFHA COUNTS AGAINST ABERDEEN and WATERFORD</u>

WHEREFORE, Plaintiff, demands judgment against Defendants, ABERDEEN and WATERFORD, and requests the following relief:

a.  Declaring that the policies and procedures of Defendants violate the FHA and FLFHA, in that they fail to consider and accommodate the needs of disabled individuals such as the Plaintiff;

b.  Directing Defendants to grant Plaintiff's necessary and reasonable accommodations;

c.  Awarding compensatory and punitive damages pursuant to 42 U.S.C. § 3613;

d.  Awarding reasonable attorneys' fees and costs; and

e.  Any further relief this Court deems necessary, just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff, LORI ROBINS, by and through the undersigned Counsel, demands a trial by jury on all issues so triable.

Dated: December 2, 2024.

**Sconzo Law Office, P.A.**
3825 PGA Boulevard, Suite 207
Palm Beach Gardens, FL 33410
Telephone: (561) 729-0940
Facsimile: (561) 491-9459

By: */s/ **Gregory S. Sconzo***
GREGORY S. SCONZO, ESQ.
Florida Bar No.: 0105553
MICHELLE C. GENAO, ESQ.
Florida Bar No. 1050251
**Primary Email:** greg@sconzolawoffice.com
**Primary Email:** michelle@sconzolawoffice.com
**Secondary Email**: perri@sconzolawoffice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 2, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record in this action via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ **Gregory S. Sconzo***
GREGORY S. SCONZO, ESQ.